IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| **ADVANCED FITNESS CONCEPTS, INC. d/b/a VULCAN STRENGTH TRAINING SYSTEMS,**<br>　　　　　　　　　　**Plaintiff,**<br>　　v.<br>**ADRIAN GLUCK and GLUCK'S GYM LLC,**<br>　　　　　　　　　　**Defendants.** | Civil Action No. 3:25-cv-878 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

Plaintiff Advanced Fitness Concepts, Inc. d/b/a Vulcan Strength Training Systems ("Vulcan" or "Plaintiff"), by its undersigned counsel and pursuant to LCivR 7.1(c), respectfully submits this memorandum in opposition to Defendants' Motion To Dismiss Plaintiff's Complaint (Doc. No. 12) ("the Motion"). Defendants seek dismissal pursuant to Rule 12(b)(2), F.R.Civ.P., arguing that the Court lacks personal jurisdiction over them.

Defendants' Motion rests on a fundamental mischaracterization of the activities of Defendants that gave rise to Vulcan's claims. The relationship between the parties began when Defendants reached out to Vulcan in North Carolina and applied for an Affiliate Agreement with it, which became binding when it was accepted by Vulcan in North Carolina. Defendants' subsequent conduct, including its false and defamatory review targeted at Vulcan in North Carolina, arose out of and was undertaken pursuant to that agreement. The facts of record are more than sufficient to establish that Defendants had the minimum contacts needed to subject them to the jurisdiction of this Court.

## STATEMENT OF THE CASE

The Complaint alleges that Defendants published a review of Vulcan's Talos All-In-One Gym product that made specific material false and misleading representations of fact. (Complaint, Doc. No. 1 at 7-8, ¶ 31.a. through h.) Defendants did this, explicitly declaring that it might put Vulcan out of business (*id.* at 6-7, ¶ 29), to promote their own business founded on profitable relationships with large competing manufacturers. (*Id.* at 9, ¶¶ 34-37) Vulcan states claims for Lanham Act false advertising, defamation, unfair trade practices, and unfair competition.

## STATEMENT OF FACTS

### Vulcan's Affiliate Program

Vulcan has marketed and sold home fitness equipment from its Charlotte, North Carolina location since 2009. (Declaration of Cyrus N. Peterson, Doc. No. 17 ("Peterson Declaration") at 1, ¶ 2) It has for many years offered an Affiliate program for people or companies who wish to promote Vulcan products. (*Id.* at 1-2, ¶ 4) They go to Vulcan's web site, where they must first create an account with Vulcan (*id.* at 2, ¶ 5), and are then presented with the Vulcan Affiliate Program Agreement. (*Id.*, ¶ 8 and attached Exhibit E, Doc. No. 17-5) If they agree, they submit their agreement to Vulcan for approval. (*Id.*, ¶ 7) The linked "About Us" page states Vulcan's North Carolina location. (*Id.*, ¶ 6 and attached Exhibit C, Doc. No. 17-3) The linked "Terms and Conditions" page provides that use of the site is governed by North Carolina law, and jurisdiction and venue of any legal proceeding arising out of or relating to the site is in the state or federal courts in Charlotte, North Carolina. (*Id.*, ¶ 7 and attached Exhibit D, Doc. No. 17-4)

### Defendants' Contractual Relationship With Vulcan

In 2021, Defendants initiated exactly this process, using Vulcan's web site to agree to the

2

Case 3:25-cv-00878-FDW-SCR     Document 16     Filed 01/12/26     Page 2 of 15

Affiliate Agreement and submit it to Vulcan in North Carolina for acceptance. (Complaint at 5, ¶ 18; Peterson Declaration at 3, ¶ 11) Vulcan had had no contact with Defendants prior to this submission. (*Id.*, ¶ 12) Vulcan approved Defendants' application and their Affiliate account was created effective August 16, 2021. (*Id.* at 3, ¶ 11 and attached Exhibit F, Doc. No. 17-6).

The Affiliate Agreement that Defendants entered into had the stated purpose of providing Defendants "with the opportunity to promote Vulcan products in exchange for commissions on sales directly attributed to the Affiliate's efforts." (Doc. No. 17-5 at 1) It explicitly contemplated that Vulcan products may be provided to Defendants "for the purpose of promoting said products," (*id.*), and Defendants agreed to "Avoid slander, misrepresentation, or disparagement of Vulcan products, services, or reputation." (*Id.*)

Over the next three years, acting pursuant to this Agreement, Defendants promoted Vulcan in their sales pages from time to time, generating about 1,500 clicks through to Vulcan's web site and a sale or two each year. (*Id.* at 4, ¶ 16).

On April 1, 2024, Defendant Gluck emailed Vulcan to express interest in "creating dedicated YouTube reviews of equipment like your Talos." (*Id.* at 3, ¶ 13) This was the first mention by anyone of the possibility of Gluck producing a Talos review. (*Id.*, ¶ 14)

Gluck again pursued the subject a month later, directly asking, "Any interest in us reviewing your Forge and Talos?" (*Id.* at 3-4, ¶ 15) Vulcan's CEO responded that a review would be of interest (*id.* at 4, ¶16), but said Gluck first needed to take an additional step to finalize his Affiliate account, providing a link for that purpose. (*Id.* at 4, ¶ 18) Gluck responded within minutes that he had done so. (*Id.*) Vulcan subsequently paid Defendants the accumulated commissions earned from sales to users that Defendants had directed to Vulcan's North Carolina web site. (*Id.*, ¶ 19)

3

With the Affiliate Agreement firmly in place, Gluck again proposed that he review the Talos. (*Id.*, ¶ 21) Gluck persisted in making renewed requests to Vulcan for a Talos review product in January 2025 and May 2025. (Complaint at 5, ¶ 20) In initiating and pursuing these contacts with Vulcan, he knew that Vulcan was located in Charlotte, North Carolina, in this judicial district. (*Id.*) The parties exchanged emails on the topic over several months, culminating in Vulcan shipping a Talos Home Gym System to Gluck from its North Carolina warehouse at no charge in June 2025. (*Id.*, ¶ 21; Peterson Declaration at 4-5, ¶ 22) This enabled Gluck to record the false and misleading video review of the Talos that Defendants eventually published on multiple online platforms, as alleged in the Complaint.

**Defendants' Exploitation of Their Defamatory Review**

Defendants assert in their supporting brief (Doc. No. 12-1) ("Defendants' Brief") that they are merely "an individual consumer reviewer" (*id*. at 6), and that their YouTube video was only "passive web content that makes information available to interested viewers." (*Id.* at 13) These statements are inaccurate.

Defendants' false and misleading video was first posted on Patreon.com, a web site where users were required to pay a subscription fee to Defendants to see the video. (Complaint, Doc. No. 1, at 4, ¶ 16, and at 6-7, ¶ 29). When Defendants then posted the review on YouTube, they displayed immediately below the video itself active links to Defendants' website, and specifically to their "Affiliates" page. (Declaration of Rodrick J. Enns, Doc. No. 18, attached Exhibit A, Doc. No. 18-1) That page lists dozens of promotional links to Vulcan's competitors, many noting that use of "the Code GLUCK" will provide the user with savings when buying from that company. (*Id.*, attached Exhibit B, Doc. No. 18-2) Among the competitors that Defendants promote is another North Carolina company, Freedom Fitness Equipment. (Peterson

4

Declaration at 4-5, ¶ 22)

Defendants even maintained a "Black Friday Sales" page on their site (Enns Declaration, attached Exhibit C, Doc. No. 18-3), which aggressively promoted competitor offerings and actively encouraged users to purchase because "if you click on one and buy something we'll receive a small commission." (*Id.*) Far from being "an individual consumer reviewer," then, Defendants operate a sophisticated media enterprise, and they leveraged their attention-grabbing defamatory review of Vulcan's product to drive their business and profits. Indeed, in the video itself, Gluck asserts that the video will "lose me money, a lot of it, so go subscribe…," with a subscribe link superimposed on the screen. (Complaint at 9, ¶ 37)

In order to execute this plan, Gluck engaged in more than one hundred email and text exchanges and telephone calls with Vulcan in North Carolina over the last two years. (Peterson Declaration at 5, ¶ 23) North Carolina consumers were exposed to and influenced by the resulting defamatory video (*id.*, ¶ 25), and the substantial harm from Defendants' conduct was felt and continues to be felt by Vulcan at its headquarters here.

## ARGUMENT

Defendants' Motion rests on the proposition that they did no more than post an informational review to a passive web site located outside North Carolina, and otherwise "lack any meaningful connection with the state." (Defendants' Brief at 8) They are able to make this argument only by ignoring the allegations of the Complaint that Defendants intentionally initiated a contractual relationship with Vulcan in North Carolina, and repeatedly solicited Vulcan to send them review equipment from North Carolina pursuant to that Affiliate Agreement, without which their defamatory review could never have been created. While Defendants never physically entered the state, their agreement with Vulcan was formed in North

5

Carolina at their initiative and is governed by North Carolina law.  Over the course of their years of performance pursuant to that agreement, Defendants directed more than one hundred emails and telephone calls to Vulcan in North Carolina, and referred at least 1,500 internet users to Vulcan's North Carolina web site, generating sales for Vulcan in North Carolina from which Defendants earned commissions.   These facts amply support this Court's exercise of specific jurisdiction over Defendants to remedy the substantial harm inflicted on Vulcan in this state.

## I.  LEGAL STANDARDS UNDER RULE 12(b)(2)

A challenge to personal jurisdiction under Rule 12(b)(2), F.R.Civ.P., generally requires "a two-step analysis: (1) the Court must determine whether the North Carolina long-arm statute confers personal jurisdiction; and (2) the Court must determine whether the exercise of that statutory power will violate the due process clause of the U.S. Constitution." *Noble Bottling, LLC v. Reinhart Holdings, LLC*, No. 3:22-CV-00083-KDB-DCK, 2022 U.S. Dist. LEXIS 135771, at *3 (W.D.N.C. July 30, 2022).  However, "[b]ecause the North Carolina long-arm statute extends jurisdiction to the bounds of due process, the statutory inquiry ultimately merges with the constitutional inquiry, becoming one." *Id., citing ESAB Grp., Inc. v. Centricut, Inc.,* 126 F.3d 617, 623 (4th Cir. 1997), *cert. denied,* 523 U.S. 1048 (1998).

The Court may decide the issue based on "the motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint," in which case the plaintiff "need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).  The Court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Universal Leather, LLC v. Koro Ar, S.A.,* 773 F.3d 553, 558 (4th Cir. 2014), *cert. denied,* 576

6

U.S. 1035 (215), *quoting Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  If there are conflicting declarations, the Court is "required to assume the credibility of [plaintiff]'s version of the facts, and to construe any conflicting facts in the parties' affidavits and declarations in the light most favorable to [plaintiff]."  *Universal Leather*, 773 F.3d at 560.

## II. THIS COURT HAS SPECIFIC JURISDICTION OVER DEFENDANTS

There are two types of personal jurisdiction, specific and general.  *Universal Leather*, 773 F.3d at 559.  Here, there is no need to inquire into general jurisdiction, because the facts of record squarely support specific jurisdiction over Defendants.

Courts in the Fourth Circuit employ a three-part test to determine whether the exercise of specific personal jurisdiction over a nonresident defendant comports with the requirements of due process:  "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Tire Engineering & Distribution, Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012), *cert. denied,* 568 U.S. 1087 (2013).  An overarching principle is that "'[f]airness is the touchstone of the jurisdictional inquiry.'"  *Universal Leather*, 773 F.3d at 559, *quoting Tire Engineering,* 682 F.3d at 302.l

### A. Defendants Purposefully Availed Themselves of the Privilege of Conducting Activities in North Carolina

The "purposeful availment" inquiry "asks whether 'the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there.'"  *Dmarcian, Inc. v. Dmarcian Eur. BV*, No. 1:21-cv-00067-MR, 2021 U.S. Dist. LEXIS 99380, at *20 (W.D.N.C. May 26, 2021), *aff'd in relevant part,* 60 F.4th 119 (4th Cir. 2022), *quoting Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658 (4th Cir. 1989), *quoting in*

7

turn *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This is a "flexible" analysis, in which courts consider multiple factors on a case-by-case basis. *Universal Leather*, 773 F.3d at 560.

The facts of record show purposeful availment by Defendants in this case:

### 1. Defendants Initiated the Contractual Relationship with Vulcan in North Carolina

When a defendant has reached into the forum and "created 'continuing obligations' between himself and residents of the forum," then "he manifestly has availed himself of the privilege of conducting business there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).[1] The Fourth Circuit accords "special weight to the fact that it was [defendant] that initiated contact with the [plaintiff]." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 295 (4th Cir. 2009). *See also Dmarcian, Inc. v. Dmarcian Eur. BV,* 60 F.4th 119, 133 (4th Cir. 2022) ("Our court 'place[s] special importance on the fact that defendant initiated contact with the plaintiff in the forum state,'" *quoting Sneha Media & Entm't, LLC v. Associated Broad. Co. P*, 911 F.3d 192, 200 (4th Cir. 2018)).

Here, the record (summarized *supra* at 2-4) establishes that Defendants reached out to initiate a relationship with Vulcan, knowing Vulcan was located in North Carolina. Defendants agreed to an Affiliate Agreement and submitted it to Vulcan in North Carolina via Vulcan's web site. The agreement was finalized and became binding when Vulcan accepted it in North

---

[1] The defendant need not have physically entered the forum. In *Burger King*, the Supreme Court made clear that jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State." *Id.* Even in 1985, it was "an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* As a result, "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* (citing cases).

Carolina, and it therefore was governed by North Carolina law. *See Avis Rent a Car Sys., LLC v. Andrews*, 256 N.C. App. 163, 805 S.E.2d 566 (2017) (unpublished) (under principle of *lex loci contractus,* "the substantive law of the state where the last act to make a contract occurs governs all aspects of the contract.") And the web site that Defendants used to set up their account with Vulcan and to submit their contractual offer explicitly provided that its use was governed by North Carolina law, and that North Carolina courts would be the forum for any resulting disputes.

### 2. Nature, Quality, and Extent of Communications

Another important factor in the calculus is "the nature, quality and extent of the parties' communications about the business being transacted." *Universal Leather*, 773 F.3d at 560. Defendants here engaged in at least one hundred emails, text messages, and telephone communications with Vulcan in North Carolina over the last two years, and more than eighty of those directly related to the review equipment that was at the core of Defendants' tortious conduct. (Peterson Declaration at 5, ¶ 23.) Defendants obviously knew of all these communications, but failed to inform the Court about them, instead implying that there were only four because the Complaint only mentioned four specifically.[2] (Defendants' Brief at 13)

### 3. Impact on Vulcan in North Carolina

While not sufficient by itself, "the place that the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry…" *Young v. New Haven Advocate*, 315 F.3d 256, 262 (4th Cir. 2002), *cert. denied,* 538 U.S. 1035 (2003), *quoting ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 626 (4th Cir. 1997), *cert. denied* 523 U.S. 1048 (1998). Here, the substantial and ongoing harm to Vulcan was and is being felt at its Charlotte, North Carolina offices, which

---

[2] In fact, the Complaint references "multiple communications" that Defendants had with Vulcan in 2024 and 2025. (Complaint at 5-6, ¶¶ 18-27)

Defendants clearly intended given that the title they first gave to their video declared that by posting it, they "killed the Vulcan Talos (& maybe Vulcan too)." (Complaint at 6-7, ¶ 29).

### 4. Impact on North Carolina Public

Defendants claim that they did not target the North Carolina public specifically, but parties are generally held to intend the foreseeable consequences of their actions, and it certainly was foreseeable that Defendants' conduct would have an impact on the public in North Carolina where Vulcan is located, as indeed it did. (Peterson Declaration at 5, ¶ 25) *See, e.g., Noble Bottling,* 2022 U.S. Dist. LEXIS 135771, at *10-11 ("Noble has its principal place of business in North Carolina, so Weber's emails into the state in alleged furtherance of the scheme establish that Weber intended to engage in interactions in North Carolina.").

### 5. Reasonable Anticipation of Suit in North Carolina

The central question is "whether 'the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there.'" *Universal Leather*, 773 F.3d at 559-60, *quoting Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658 (4th Cir. 1989), *quoting in turn World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). In this case, Defendants certainly should have anticipated that they would be subject to suit in North Carolina. They sent an Agreement to Vulcan for acceptance by it in North Carolina; the web site they used to do so explicitly stated that any disputes arising out of that use would be resolved in the North Carolina courts; and they leveraged that Agreement to publish their defamatory video despite its provision that they would not misrepresent Vulcan products. *See Joe Hand Promotions, Inc. v. Shehadeh,* No. 18-4119, 2019 U.S. Dist. LEXIS 79206, at *7-8 (E.D. Pa. May 10, 2019) ("Defendants knew that Plaintiff was located in Pennsylvania," so when they emailed Plaintiff "requesting a quote for showing the fight, only to reject that quote and

10

allegedly broadcast the fight anyway, Defendants clearly should have expected to be sued in Pennsylvania.").

Indeed, not only should Defendants have anticipated suit, but they actually did. In the defamatory video itself, Gluck claimed that he had been the target of legal action in the past due to his reviews, and then said the Talos review "will lose me thousands of dollars" (Complaint at 9, ¶ 37), implying he expected this video to generate a lawsuit as well.

### 6. Additional North Carolina Contacts

Contrary to their representations, Defendants have an ongoing affiliate relationship with at least one other North Carolina company, Freedom Fitness Equipment. As they did with Vulcan, Defendants actively promote Freedom Fitness products, and direct users to the Freedom Fitness web site with promotional incentives. (Peterson Declaration at 5, ¶ 24)

*****

Taken collectively, these facts establish that Defendants' contacts with North Carolina were not "'random,' 'fortuitous,' or 'attenuated' contacts, or the 'unilateral activity of another party or a third person.'" *Burger King,* 471 U.S. at 475. Rather, Defendants intentionally created "continuing obligations" between themselves and Vulcan, a resident of the forum, and therefore "manifestly ha[ve] availed [themselves] of the privilege of conducting business there." *Id.* In *Noble Bottling*, this Court found that two emails directed from outside the state to a North Carolina plaintiff that helped cover up an alleged fraud were sufficient to establish purposeful availment, noting that "emails and text messages directed at the forum can give rise to specific jurisdiction." 2022 U.S. Dist. LEXIS 135771 at *9. *See also, e.g., Joe Hand Promotions, Inc.,* 2019 U.S. Dist. LEXIS 79206, at *7-8 (finding purposeful availment based on sending of a single email into the forum).

### B. Vulcan's Claims Arise Directly Out Of Defendants' North Carolina Contacts

Defendants acknowledge that the analysis under the second part of the specific jurisdiction inquiry "is generally not complicated," and is "easily satisfied" when "activity in the forum state is the genesis of the dispute." (Defendants' Brief at 14, *quoting Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012)). The current dispute had its genesis in Defendants reaching out to establish an Affiliate Agreement with Vulcan in North Carolina, and then leveraging that relationship to persuade Vulcan to send them review equipment from its North Carolina warehouse. Without that agreement, formed under and governed by North Carolina law, Vulcan would never have sent Defendants the Talos product (Peterson Declaration at 4, ¶ 20), and Defendants could not have created their false and misleading video.

Defendants argue that their contacts with Vulcan in North Carolina "do not form the genesis of the dispute—the YouTube video does," because "[i]n the absence of the video, communication between the parties would not give rise to this suit." (Defendants' Brief at 15) But this turns the analysis on its head. Posting of the defamatory video was the <u>culmination</u> of Defendants' scheme, but not the genesis or beginning of it. If Defendants' interpretation were accepted, then no amount of contact with a forum laying the groundwork for wrongful conduct would be sufficient, so long as the final tortious act occurred elsewhere. That is not the law. *See, e.g., CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 295 (4th Cir. 2009) (holding that a preliminary meeting in the forum "was the genesis of this dispute" even though no agreement was reached there, because it led to later signing of a License Agreement elsewhere which was then breached by conduct in India, forming "a seamless series of business transactions from [the forum] visit to the filing of the Complaint.").

12

## C. The Court's Exercise Of Personal Jurisdiction Over Defendants Is Constitutionally Reasonable

Once minimum contacts are established under the first two factors, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477. Defendants have not even attempted to make such a showing, merely offering speculation about litigation hardship without any support in the record. (Defendants' Brief at 16)

## D. Defendants Rely on Case Law That Does Not Apply

To support their Motion, Defendants primarily rely on a line of cases beginning with *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.,* 293 F.3d 707 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003), which concerned the question of "a State's jurisdiction over persons outside of the State based on Internet activity." 293 F.3d at 712. The Fourth Circuit addressed this then-novel scenario by adopting the "sliding scale" model developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.,* 952 F. Supp. 1119 (W.D. Pa. 1997), which turns primarily on the level of interactivity of the web site. *ALS Scan,* 293 F.3d at 713.

But *ALS Scan* and its progeny explicitly apply only to cases where the defendant hosting an out-of-state internet site lacks any other direct contacts with the forum. *See ALS Scan,* 293 F.3d at 715 ("the only direct contact that Digital had with Maryland was through the general publication of its website on the Internet"); *Young v. New Haven Advocate*, 315 F.3d 256, 262 (4th Cir. 2002), *cert. denied*, 538 U.S. 1035 (2003) (defendants' "contacts arose solely from the newspapers' Internet-based activities"); *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 141 (4th Cir. 2020) ("we are again left with Marriott's operation of its website as the only arguable jurisdictional hook connecting this case to South Carolina"); *Khashoggi v. NSO Grp. Techs. Ltd.,*

13

138 F.4th 152, 160 (4th Cir. 2025) (citing district court finding that "Khashoggi had not plausibly alleged any 'specific Virginia-related conduct by NSO Group.'").

As a result, the *ALS Scan* line of cases simply do not apply here. Defendants' internet postings were far from the "passive web content" that Defendants claim (see discussion *supra* at 4-5), but they were in any event generated by means of substantial and ongoing direct contacts with Vulcan in North Carolina.

## **CONCLUSION**

Defendants reached out to establish a relationship with Vulcan in North Carolina, and maintained that relationship for years, sending scores of communications into the state, transmitting click-throughs to Vulcan in North Carolina, and earning commissions as a result. They ultimately leveraged the relationship to induce Vulcan to send them free review equipment, which enabled them to create a false and misleading video that was intended to and did inflict significant harm on Vulcan. It is fundamentally fair that they be held to account in this Court for these actions. Vulcan respectfully asks that Defendants' Motion be denied.

Dated: January 12, 2026

Respectfully submitted,

**/s/Rodrick J. Enns**
Rodrick J. Enns
N.C. State Bar No. 12151
ENNS & ARCHER LLP
939 Burke Street
Winston-Salem, NC 27101
Telephone: (336) 723-5180
E-mail: renns@ennsandarcher.com

*Attorneys for Plaintiff Advanced Fitness Concepts, Inc. d/b/a Vulcan Strength Training Systems*

**Certification of Compliance with Word Limitation**

The undersigned counsel hereby certifies that this submission complies with the 4,500 word limitation of Section 3.b.iv. of the Court's Initial Scheduling Order.

Dated: January 12, 2026  **/s/Rodrick J. Enns**
Rodrick J. Enns
N.C. State Bar No. 12151
ENNS & ARCHER LLP
939 Burke Street
Winston-Salem, NC  27101
Telephone:  (336) 723-5180
E-mail:  renns@ennsandarcher.com

*Attorneys for Plaintiff Advanced Fitness Concepts, Inc. d/b/a Vulcan Strength Training Systems*

**Certification of Counsel Concerning Use of Artificial Intelligence**

The undersigned counsel hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the Lexis on-line legal research service; and

2. Every statement and every citation to an authority contained in this document has been checked by the undersigned attorney in this case as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: January 12, 2026  **/s/Rodrick J. Enns**
Rodrick J. Enns
N.C. State Bar No. 12151
ENNS & ARCHER LLP
939 Burke Street
Winston-Salem, NC  27101
Telephone:  (336) 723-5180
E-mail:  renns@ennsandarcher.com

*Attorneys for Plaintiff Advanced Fitness Concepts, Inc. d/b/a Vulcan Strength Training Systems*